# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### FLORENCE DIVISION

| | | |
|---|---|---|
| Gail M. Hutto, Debra J. Andrews, Elizabeth W. Hodge, Margaret B. Lineberger, Lynn R. Rogers, Nancy G. Sullivan, Jane P. Terwilliger, Julian W. Walls, and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 4:10-cv-02018-JMC |
| v. | ) ) | **ORDER AND OPINION** |
| The South Carolina Retirement System, the Police Officers Retirement System, the South Carolina Retirement Systems Group Trust, Mark Sanford, Governor of South Carolina, in his official capacity as *ex officio* Chairman of the South Carolina Budget and Control Board, Richard Eckstrom, Comptroller General of the State of South Carolina, in his official capacity as an *ex officio* member of the South Carolina Budget and Control Board, Hugh K. Leatherman, Chairman of the South Carolina House of Representatives Ways and Means Committee, in his official capacity as an *ex officio* member of the South Carolina Budget and Control Board, Daniel T. Cooper, Chairman of the South Carolina Ways and Means Committee, in his official capacity as Executive Director of the South Carolina Budget and Control Board, and Peggy G. Boykin, in her official capacity as Director of the Retirement Division of the South Carolina Budget and Control Board, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiffs are retired members of a pension trust plan[1] administered by the South Carolina Retirement Systems ("Retirement Systems") who were rehired on or after July 1, 2005, by employers participating in the Retirement Systems.  Plaintiffs bring this action, on behalf of themselves and others similarly situated, challenging the constitutionality of South Carolina's State Retirement Systems Preservation and Investment Reform Act ("Act 153").  They specifically allege Act 153 violates their constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution by requiring them to contribute to the Retirement Systems upon their rehiring without providing them with any additional benefits or service credit.  Currently before the court is Defendants' Supplemental Motion to Dismiss [Dkt. No. 32] under Federal Rules of Civil Procedure 12(b)(1), (3), and (6).  Defendants contend in their motion that, among other things, Plaintiffs' action is barred in federal court by the doctrine of sovereign immunity.  For the reasons set forth below, the court grants Defendants' motion.

## FACTUAL AND PROCEDURAL BACKGROUND

Prior to July 1, 2005, all South Carolina State employees were eligible to retire, collect their pension benefits, and later return to work for the State.  After returning to work, the employees would be paid a salary and continue to receive pension benefits from their retirement. These "working retirees" were not required to contribute any further to the Retirement Systems upon their return to work.[2]  However, the General Assembly enacted Act 153, which became

---

[1] The pension trust plans at issue in this case are (1) the South Carolina Retirement System ("SCRS"), which provides retirement benefits to employees of the State and its political subdivisions; and (2) the South Carolina Police Officers Retirement System ("PORS"), which provides retirement benefits to police officers.  *See* S.C. Code Ann. §§ 9-1-20, 9-11-20 (Supp. 2010).  The SCRS and the PORS along with other pension trusts are managed by the South Carolina Retirement Systems.

[2] Prior to the Act 153 amendments, South Carolina would withhold the normal pension benefits due to participants in the Teacher and Employee Retention Incentive Program ("TERI");

effective on July 1, 2005, amending several statutes relating to the operation of the SCRS and the

PORS.  The relevant statutes affected by Act 153 require:

> A retired member [to] pay to the [retirement] system the employee contribution as if the member were an active contributing member if an employer participating in the system employs the retired member.  The retired member does not accrue additional service credit in the system by reason of the contributions required . . . .

S.C. Code Ann. §§ 9-1-1790(C), 9-11-90(4)(c) (2012).[3]

This change in the law spawned two lawsuits in the South Carolina state courts.  The

first, *Layman v. State of South Carolina*, 368 S.C. 631, 630 S.E.2d 265 (2006), involved retired

State employees who had returned to work for the State prior to July 1, 2005.  Each *Layman*

plaintiff participated either in the TERI retirement program, the SCRS, or the PORS.  The

*Layman* plaintiffs alleged Act 153 was facially invalid for violating the Takings and Due Process

Clauses of the South Carolina and United States Constitutions.  They also alleged Act 153 was

invalid as applied to them because the amendments constituted a breach of the terms of their

employment contracts formed when they returned to work under the old version of the laws

governing the Retirement Systems.  The *Layman* plaintiffs therefore requested that South

Carolina be estopped from applying Act 153 to the plaintiffs who had relied on the previous

versions of the laws.

The Supreme Court of South Carolina held Act 153 unconstitutional only as applied to

the retirees who participated in the TERI retirement program.  *Id.* at 642, 630 S.E.2d at 271.  In

doing so, it ruled that the South Carolina General Assembly created a binding employment

---

however, it would either pay these accrued benefits as a lump sum or roll the benefits over into a qualifying retirement fund.  *Layman*, 368 S.C. at 635, 630 S.E.2d at 267.  For all other State retirement programs, the working retiree was not required to make further contributions into the system but was also limited to making no more than $50,000 per year in salary.  *Id.*

[3] Plaintiffs specifically challenge these two statutes in the present action.

contract through the old version of the TERI statute; therefore, the Act 153 amendments breached that contract by retroactively changing the terms of employment to require a retiree participating in the TERI program to pay additional sums into the Retirement Systems. *Id.* at 268-71. The South Carolina Supreme Court additionally held that working retirees under the SCRS and the PORS had no such similar contract created by the retirement statutes. *Id.* However, because some working retirees may have had written contracts that specifically promised that they would not have to make further contributions to the Retirement Systems, the breach of contract issue was remanded for specific factual determinations. *Id.* at 271-72. The *Layman* Court declined to address the facial challenges to Act 153, but it did recognize that the Act 153 amendments to the retirement statutes "continue[] to be valid and all those participants joining after July 1, 2005, are subject to the entirety of the requirements outlining the new [working retiree programs]. It is fully within the power of the legislature to make changes to laws that impact future participants . . . ." *Id.* at 272.

On remand, the action continued under the caption *Ahrens v. State of South Carolina*, 392 S.C. 340, 709 S.E.2d 54 (2011), and only involved working retirees in the SCRS and the PORS who were rehired before July 1, 2005. There, the South Carolina Supreme Court held that there was no contract between the SCRS or the PORS and the working retiree plaintiffs. *Id.* at 58-60. It found this in part because, even if there was a contract formed, the Retirement Systems did not have the authority to enter into such a contract. Accordingly, any contract that may have been formed was found to be invalid. *Id.* at 60-61.

The *Ahrens* Court further held that South Carolina could not be estopped from requiring the plaintiffs to contribute to the SCRS or the PORS, despite the plaintiffs having retired *prior to* the effective date of the Act 153 amendments. *Id.* at 60-64. In making this determination, the

South Carolina Supreme Court observed that a working retiree did not incur a substantial economic burden from the additional contributions. The Court calculated the lifetime pension benefits received by two different State employees. *Id.* at 62. One, Employee A, was a working retiree who did not accrue any additional service credit once he returned to work but who did receive his full pension benefits from his original retirement while working his new job. *Id.* The other, Employee B, was an employee who accrued service credit until Employee A retired for a second time. *Id.* The Court concluded it would take at least twenty-five (25) years for Employee B to receive a higher lifetime benefit than Employee A, despite accruing more service credit. *Id.* at 62-63.

Again, the South Carolina Supreme Court did not discuss the constitutional issues, but it did affirm the lower court's grant of summary judgment denying relief on the takings and due process claims. *Id.* at 63 ("Accordingly, we conclude that summary judgment was proper as to the constitutional issues raised by" the plaintiffs.); *see also Ahrens v. South Carolina*, No. 05-CP-40-2785 (S.C. Ct. C.P. 15th Jud. Cir. Sept. 3, 2009) (amending its order because "Defendants argued that the existing Orders on the merits did not expressly rule on the theories of relief pleaded by Plaintiffs other than breach of contract and estoppel. The Court agrees with the Defendants' position as to [the takings and due process] claims and, therefore, denies relief to Plaintiffs on all theories other than estoppel.").

Despite the unfavorable rulings in *Layman* and *Ahrens* with respect to the constitutional claims, Plaintiffs pursued this federal lawsuit making substantially similar claims. To contrast this action with the state court actions, the court notes that the *Layman* and *Ahrens* plaintiffs retired prior to Act 153's enactment and were nonetheless required to pay additional money into the Retirement Systems without accruing additional service credit. Here, Plaintiffs are

employees who retired after July 1, 2005, the effective date of the Act 153 amendments, and therefore should have known that the South Carolina retirement laws mandated the controverted payment for those who chose to return to work for the State.[4]

In the instant case, Plaintiffs assert that they have suffered a taking[5] and an infringement of their due process rights in violation of the Fifth and Fourteenth Amendments. They assert that the differences in the date they retired as opposed to the *Layman* and *Ahrens* plaintiffs raise different constitutional issues that were not decided at the state court level. [Dkt. No. 33, at 10;

---

[4] Since the advent of this case, and even after the *Layman* and *Ahrens* decisions, the General Assembly has made further changes to the SCRS and the PORS statutes that more clearly evidence its motivation in requiring working retirees to continue to pay into the Retirement Systems. Under the current version of Act 153 and S.C. Code Ann. § 9-1-1790(A), working retirees like Plaintiffs may receive their full retirement benefits while working their new jobs. However, on June 26, 2012, the South Carolina General Assembly amended Subsection (A) so that, starting January 2, 2013, working retirees receive their full retirement benefits only until they earn up to $10,000 in one calendar year. Act of June 26, 2012, 2012 S.C. Acts 278, Sec. 14.A (amending S.C. Code Ann. § 9-1-1790(A) (2012)). Once they earn $10,000, their retirement allowance is discontinued for the remainder of that calendar year. *Id.*

In enacting these additional changes to Act 153, the South Carolina General Assembly found that the financial stability and long-term viability of the Retirement Systems are being threatened by the funding ratio of the pension plans, which has eroded over the past ten years and is now in the lowest third of state-defined benefit plans in the United States. *Id.* at Sec. 1(B). The General Assembly stated that system stability and certainty of benefits to participants are "paramount," and all parties therefore must share the costs of assuring the systems' sustainability over the long term. *Id.* Additionally, it found that "addressing the threats to the long-term sustainability of the system requires shared sacrifice by employers, employees, and system retirees. Thus, employers and employees must pay more to fund the system, and system retirees must understand that future prospective benefit adjustments and other post-retirement prospective benefit adjustments are not inevitable." *Id.* at Sec. 1(C). Finally, the General Assembly stated that the recent changes were "intended to satisfy the principle of intergenerational equity, that is, pension costs should be allocated among employees, employers and taxpayers on an equitable basis over time and not perpetually pushed into the future or immediately imposed on current taxpayers." *Id.* at Sec. 1(D).

[5] Plaintiffs argue that the taking is a result of South Carolina deducting 6.5% of their wages to fund the Retirement Systems allegedly without giving Plaintiffs anything in exchange for their contribution.

Dkt. No. 16, at 7]. Plaintiffs seek declaratory and injunctive relief requesting this court to (1) determine that the statutes in question are unconstitutional; (2) order Defendants to provide an accounting of all contributions made by Plaintiffs to the Retirement Systems since July 1, 2005; (3) require Defendants to return the money received; and (4) prohibit Defendants from enforcing the statutes in the future. Plaintiffs additionally seek attorney's fees and costs associated with the litigation.[6]

In their initial Motion to Dismiss [Dkt. No. 11], Defendants contended the court should abstain from hearing the action. Defendants further argued that the court should exercise its discretion to decline to hear the action under the Declaratory Judgment Act. Defendants also asserted various grounds for dismissal, including Eleventh Amendment sovereign immunity, failure to exhaust administrative remedies, res judicata, collateral estoppel, laches, improper venue, and failure to state a claim upon which relief could be granted.

After review of the parties' submissions on Defendants' initial motion, the court requested additional information [Dkt. No. 30] regarding the sovereign immunity argument and the impact of *Ahrens* on the present action.[7] In response to the court's request, Defendants filed their Supplemental Motion to Dismiss [Dkt. No. 32]. Plaintiffs filed a response to the supplemental motion [Dkt. No. 33]. The court held a hearing on this matter on September 5, 2012.

---

[6] Although Plaintiffs presented arguments to the court during the hearing on this motion concerning potential violations of the Internal Revenue Code by Defendants, the Complaint contains no cause of action asserting a claim for the violation of the Internal Revenue Code. Accordingly, the court only addresses the causes of action asserted in the Complaint.

[7] *Ahrens* was pending in the state courts when the initial Motion to Dismiss was filed. However, it was decided prior to the court's consideration of the present motion, and the court requested the additional briefing in order to understand and consider the impact of the South Carolina Supreme Court's decision on the issues raised here.

## LEGAL STANDARD

"Eleventh Amendment immunity has attributes of both subject-matter jurisdiction and personal jurisdiction." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 480 (4th Cir. 2005). It is like subject matter jurisdiction in that it may be raised at any time, but resembles personal jurisdiction in that it may be waived by the state. *Id.* As a result "the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so." *Id.* at 481 (citing *Wis. Dep't of Corr. v. Schacht,* 524 U.S. 381, 389 (1998) and *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997) ("The Amendment, in other words, enacts a sovereign immunity from suit, rather than a non-waivable limit on the Federal Judiciary's subject-matter jurisdiction.")).

"Although subject matter jurisdiction and sovereign immunity do not coincide perfectly, there is a recent trend among the district courts within the Fourth Circuit to consider sovereign immunity under Rule 12(b)(1)." *Trantham v. Henry Cnty. Sheriff's Office*, 4:10-cv-00058, 2011 WL 863498 (W.D. Va. Mar. 10, 2011) *aff'd,* 435 F. App'x 230 (4th Cir. 2011). Therefore, the court will consider this motion pursuant to Rule 12(b)(1).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) examines whether the court lacks subject-matter jurisdiction. Generally, the burden of proving subject-matter jurisdiction is on the plaintiff, the party asserting jurisdiction. *See Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). However, where a party challenges the subject-matter jurisdiction of the court on the grounds that the party is an arm of the state entitled to sovereign immunity, the burden of persuasion lies with the party asserting the immunity. *See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d 232, 237 (2d

Cir. 2006) (noting that the majority of federal circuit courts are in agreement with this allocation of the burden of proof on the issue of sovereign immunity).

In evaluating a defendant's challenge to subject matter jurisdiction, the court is to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R.*, 945 F.2d at 768. The court should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (internal quotation marks and citations omitted).

## DISCUSSION

**Eleventh Amendment Immunity**

The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend. XI. Though not explicitly stated in the language of the amendment, courts have long held that this guarantee also protects a state from federal suits brought by its own citizens, not only from suits by citizens of other states. *Hans. v. Louisiana*, 134 U.S. 1 (1890); *Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304 (1990). "The ultimate guarantee of the Eleventh Amendment is that non-consenting States may not be sued by private individuals in federal court." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). Sovereign immunity under the Eleventh Amendment "is concerned not only with the States' ability to withstand suit, but with their privilege not to be sued" in the first instance. *Alabama v. North Carolina*, 130 U.S. 2295, 2319-20 (2010) (quoting *P. R. Aqueduct and Sewer Auth. v. Metcalf &*

*Eddy, Inc.,* 506 U.S. 139, 147, n. 5 (1993)).  Accordingly, once the defendant raises the jurisdictional issue of immunity, the court must resolve this threshold matter prior to addressing the merits of the plaintiff's claims.  *See Steele Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 94-95 (1998) (extensively discussing the importance of establishing proper jurisdiction before considering the merits of a claim).

The phrase "against one of the United States" has long been interpreted to include certain state agents and state instrumentalities such that these may also be immune from suit in federal court.  *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).  However, courts must draw a line between state-created entities that are truly arms of the state, which are immune from suit, and independent political subdivisions such as counties, municipal corporations, and school boards, which typically cannot take shelter underneath the state's Eleventh Amendment immunity.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280 (1977).  As a general rule, "[t]he more an entity's independence resembles that of a political subdivision, the less likely the entity is an arm of a state."  *Pub. Sch. Ret. Sys. of Mo. v. State St. Bank & Trust Co.*, 640 F.3d 821, 827 (8th Cir. 2011) *citing Mt. Healthy,* 429 U.S. at 280 ("counties and similar municipal corporations" are not arms of states).

The ultimate question for the purposes of the Eleventh Amendment immunity is whether the state is a real, substantial party in interest.  *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 101 (1984).  Therefore, when an instrumentality or agent of the state, named as a defendant in a case, seeks to take advantage of the state's Eleventh Amendment immunity, it becomes necessary to examine the relationship between the state and the entity being sued to determine whether it should be considered an arm of the state.  *Doe*, 519 U.S. at 429.

The United States Court of Appeals for the Fourth Circuit has articulated a non-exclusive list of four factors to be considered when determining whether or not a state-created entity is an arm of the state, and thus protected from suit by the Eleventh Amendment. *S.C. Dept. of Disabilities and Special Needs v. Hoover Univ. Inc.*, 535 F.3d 300, 303 (4th Cir. 2008). These factors are:

> (1) whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State;[8] (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions; (3) whether the entity is involved with State concerns as distinct from non-state concerns, including local concerns; and (4) how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

*Id. (*internal citations and alterations omitted*). See also U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575, 580 (4th Cir. 2012); *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (4th Cir. 2005); *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456 (4th Cir. 1987). "These factors endeavor to draw the line between 'a State-created entity functioning independently of the State from a State-created entity functioning as an arm of the State or its alter ego.'" *Oberg,* 681 F.3d at 580 (quoting *Hoover*, 535 F.3d at 303). The district court must explicitly perform this analysis before making a ruling on an Eleventh Amendment immunity defense. *Id.* at 581 (vacating a district court's motions to dismiss because

---

[8] Traditionally, the "state treasury" factor has been viewed as the most important, if not the determinative factor. *See Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 223 (4th Cir. 2001) (citing agreement among "the vast majority of Circuits" that "the State Treasury factor is the most important factor to be considered") (internal citations omitted). The Court of Appeals for the Fourth Circuit has acknowledged that the first factor may no longer outweigh the remaining factors. *Oberg*, 681 F.3d at 580 n.3 (citing *Fed. Mar. Comm'n v. S.C. Ports Auth.*, 535 U.S. 743, 765 (2002) ("The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities.").

the court failed to perform the arm-of-the-state analysis and remanding the case for application of this analysis).[9]

## A.  Effect on the State Treasury

The Supreme Court of the United States has stated: "whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the State and the entity or individual being sued." *Doe*, 519 U.S. at 430.  "A finding that the State treasury will not be affected by a judgment against the governmental entity weighs against finding the entity immune." *Cash*, 242 F.3d at 224.  Alternatively, "when the agency is so structured that . . . a judgment must expend itself against state treasuries, common sense and the rationale of the Eleventh Amendment require that sovereign immunity attach to the agency." *Id.* (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994)). Further, the proper inquiry is whether the state treasury is *potentially* liable for the judgment and not whether the state treasury will actually have to pay the judgment in a particular case.  *See Doe,* 519 U.S. at 431 ("[W]ith respect to the underlying Eleventh Amendment question, it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant.");  *see also Martin v. Clemson Univ.*, 654 F. Supp. 2d 410, 426 (D.S.C. 2009) ("[I]mmunity turns on whether the state treasury – consisting of whatever funds comprise it – is potentially liable, or would otherwise be negatively impacted by a judgment." (citing *Ristow v. S.C. Ports Auth.,* 58 F.3d 1051, 1054-55 (4th Cir.1995)).

---

[9] Plaintiffs encourage the court to allow discovery regarding whether the Retirement Systems constitute an arm of the State.  The need for such discovery is at the discretion of the district court.  *Oberg*, 681 F.3d at 580, n. 4.  Upon review of the statutory scheme, the related portions of the South Carolina Constitution, and the relevant case law, the court finds that there is sufficient material evidence currently before the court to determine whether or not Retirement Systems is an arm of the State and, therefore, finds no need for discovery on this issue.

A close examination of the statutory scheme that creates and regulates South Carolina's Retirement Systems as well as related portions of the South Carolina Constitution suggests that the State treasury may be impacted by a judgment for Plaintiffs in this case. Of particular relevance is how the State finances the Retirement Systems and the implications the funding scheme has on whether a judgment against the system would impact the State treasury. *See State St. Bank & Trust,* 640 F.3d at 830.

Title Nine of the South Carolina Code of Laws sets out the statutory scheme governing the Retirement Systems of which the SCRS and the PORS are a part. The system is primarily funded by contributions from employers and employees. S.C. Code Ann. §§ 9-1-1020 (Supp. 2010), 9-1-1050 (Supp. 2010), 9-11-210 (Supp. 2010), 9-11-220 (1986). However, the State Constitution requires the South Carolina General Assembly to "annually appropriate funds and prescribe member contributions for any state-operated retirement system which will insure the availability of funds to meet all normal and accrued liability of the system on a sound actuarial basis as determined by the governing body of the system." S.C. Const. Art. X, § 16. Further, the "[a]ssets and funds established, created and accruing for the purpose of paying obligations to members of the several retirement systems of the State and political subdivisions shall not be diverted or used for any other purpose." *Id.*; *see also Wehle v. S.C. Ret. Sys.*, 363 S.C. 394, 398, 611 S.E.2d 240, 242-43 (2005) (interpreting S.C. Const. Art. X, § 16 as giving the South Carolina Budget and Control Board "broad powers to protect the fiscal integrity of the retirement funds" and further noting that "should the Board determine that any retirement system is not funded on a sound actuarial basis, the General Assembly must provide funding necessary to restore the fiscal integrity of the System"). Thus, though fundamentally a member-funded system, the State is required to appropriate funds to protect the fiscal integrity of the system.

The Retirement Systems also receives funds directly from the State when South Carolina, as an employer, makes its annual appropriation. S.C. Code Ann. § 9-1-10(14) (Supp. 2010); S.C. Code Ann. § 9-1-1350 (Supp. 2010). *See Hadley v. N. Arkansas Cnty. Technical Coll.*, 76 F.3d 1437, 1439-41 (8th Cir. 1996) (finding that a state's appropriations for part of an entity's annual budget suggested the entity was an arm of the state).

Here, a judgment against the Retirement Systems has the potential to impact the State treasury. In the event that an award of a monetary judgment would create a shortfall in the Retirement Systems' funds, the State may have to make up the difference in accordance with its constitutional duty to ensure the availability of funds in the system to meet liabilities.[10] It is possible that the State would account for any deficit by making additional appropriations to the Retirement Systems, in which case the State treasury would be directly impacted. Alternatively, the General Assembly could require members to increase their contributions to the system to make up any shortfall. In this instance, the State of South Carolina, as an employer would have to increase its annual appropriation. Here again, a monetary judgment could impact the treasury.

---

[10] Plaintiffs rely on *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 661 (3d Cir. 1989), for the proposition that an entity is not entitled to immunity as an arm of the state where there is only an ancillary effect on the state treasury. However, the *Fitchik* court only determined that sovereign immunity was not triggered by the mere fact that the state *might* appropriate funds or make other *voluntary* payments to address shortfalls caused by judgments against the Transit Rail Operations. (emphasis added). The circumstances of *Fitchik* are distinguishable from the instant case because South Carolina actually has a constitutional duty to appropriate funds to address shortfalls in the Retirement Systems. Moreover, the autonomy factor and state law treatment as addressed in *Fitchik* weighed against a finding of sovereign immunity, whereas the opposite is true in this case. Plaintiff also relies upon *In re Lyons*, 118 B.R. 634, 636 (1990), a case in which a district court in Illinois upheld a bankruptcy court decision that the Eleventh Amendment did not bar the turnover of the Debtor's interest in the State Employees' Retirement System ("SERS"). The court determined that the small amount sought could be paid by the SERS without implicating the state treasury. *Id*. at 44. Additionally, under the Third Circuit's version of the arm-of-the-state test, the *Lyons* court found that the factors related to the entity's autonomy and its treatment under state law were not compelling. *Id*. In this case, these elements strongly suggest that the Retirement Systems is an arm of the State.

### B.   The Entity's Autonomy

The court must also consider whether the Retirement Systems functions independently of the State.  In making this determination, the court can look to both the political independence and the operational independence of the Retirement Systems.  *See, e.g., State St. Bank & Trust,* 640 F.3d at 827.

The Retirement Systems appears to lack significant political autonomy.  State officials from the legislative and executive branches are involved in the administration and operation of the Retirement Systems through their participation on the South Carolina Budget and Control Board.  The Retirement Systems' funds are administered and operated by the Budget and Control Board, which is also the trustee of the Retirement Systems.  S.C. Code Ann. § 9-1-1310 (Supp. 2010); S.C. Code Ann. § 9-1-210 (1986).  The Budget and Control Board is "comprised of the Governor, *ex officio*, who shall be chairman, the State Treasurer, *ex officio*, the Comptroller General, *ex officio*, and the chairman of the Senate Finance Committee, *ex officio*, and the chairman of the Ways and Means Committee of the House of Representatives, *ex officio*." S.C. Code Ann. § 1-11-10 (2005).  The State Treasurer is the custodian of all funds in the Retirement Systems.  S.C. Code Ann. § 9-1-1320 (1986). The State Treasurer also serves on a seven-member Retirement System Investment Commission, which has the exclusive authority, subject to State law and Article X, § 16, of the South Carolina Constitution, to invest and manage the assets of the Retirement Systems.  S.C. Code Ann. § 9-16-20; § 9-1-1310. The commissioners on the Retirement System Investment Commission are each appointed by various high-ranking State officials, with the exception of the State Treasurer who sits on the Commission pursuant to statute.  S.C. Code Ann § 9-16-315.  The Commission provides investment reports at least quarterly during the fiscal year to the State Budget and Control Board, the Speaker of the House

of Representatives, the President *Pro Tempore* of the Senate, and other appropriate officials and entities. S.C. Code Ann. § 9-16-90. The General Assembly then determines the amount of money to be paid by the employers and the amount to be deducted from the paychecks of the members. S.C. Code Ann. § 9-1-1020 and -50 (Supp. 2010). There is little doubt then that the State, through its top officials, retains significant control over the Retirement Systems.

The operation of the Retirement Systems is also highly regulated by a comprehensive statutory scheme, giving it little operational independence. For example, the statute describes the operational functions of the Retirement Systems including the general administration of the system, S.C. Code Ann. § 9-1-210 *et seq.*; how membership is determined, S.C. Code Ann. 9-1-410 *et seq.*; how service credits are calculated, S.C. Code Ann. § 9-1-810 *et seq.*; how contributions are determined, collected, and accounted for, S.C. Code Ann. § 9-1-1010 *et seq.*; how the funds are managed, held, and disbursed, S.C. Code Ann. § 9-1-1310 *et seq.*; the age of retirement, the conditions of retirement, including when and how retirement benefits are paid, S.C. Code Ann. § 9-1-1510 *et seq.*; and how the funds are invested, managed, and reported, S.C. Code Ann. § 9-16-10 *et seq.* Similar provisions control the PORS. S.C. Code Ann. § 9-11-10 *et seq.*

Other parts of the statutory scheme suggest that the system is more independent. For example, the assets of the Retirement Systems are held in trust. S.C. Code Ann. § 9-16-20 (Supp. 2010). As a result, the funds are not considered funds belonging to the State. S.C. Code Ann. § 9-1-1310(C) (Supp. 2010). However, these shades of apparent autonomy do not overcome the general impression that the system is very much an arm of the State.

Plaintiffs make much of this point, noting that the relief sought is from the fund itself, not the State treasury. The Retirement Systems counters that Plaintiffs' suit seeking both

reimbursement and attorney's fees will necessarily exceed Plaintiffs' contribution to the funds, requiring the State treasury to make up the shortfall. In *Layman v. State of South Carolina ("Layman II")*, 376 S.C. 434, 447, 658 S.E.2d 320, 327 (2008), the court found that either the State or the retirement system could be liable for attorney's fees. To the extent that there would be a similar result in this case, the Eleventh Amendment would be implicated and would bar suit in federal court.[11] The interplay between the funds sequestered in trust and State treasury funds that may be implicated in the judgment here suggests a lack of independence between the State and the Retirement Systems that this court's arm-of-the-state analysis has thus far established.

Plaintiffs also point to S.C. Code Ann. § 9-1-20, establishing that the Retirement Systems "shall have the power and privileges of a corporation," which Plaintiffs argue conveys the State's intent to create an independent entity responsible for its own debts. That view is further bolstered by S.C. Code Ann. § 9-1-1690, which provides that:

> All agreements or contracts with members of the System pursuant to any of the provisions of this chapter shall be deemed solely obligations of the Retirement System and the full faith and credit of this State and of its departments, institutions and political subdivisions and of any other employer is not, and shall not be pledged or obligated beyond the amounts which may be hereafter annually appropriated by such employers in the annual appropriations act, county appropriations acts and other periodic appropriations for the purpose of this chapter.

However, statutory language that establishes a state entity as a body corporate or corporation does not necessarily operate to waive an immunity defense under the Eleventh Amendment. *See Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 522 (1982) (Powell, J.,

---

[11] Plaintiffs conceded during their oral arguments on this motion that, should they prevail, any attorney's fees would be paid from a common fund established with the moneys recovered by Plaintiffs from the Retirement Systems. Plaintiffs contend that this arrangement would eliminate any concern that the State could be held responsible for the payment of attorney's fees in this case. However, the court is not persuaded by this argument because it still ignores the potential effect on the treasury by any shortfall resulting from the Retirement Systems' payment of a judgment in this case.

dissenting) (noting that "[a]lthough the Board of Regents was created as a body corporate with power 'to sue and be sued . . . to plead and be impleaded in all courts of law and equity,' . . . it is well established that language such as this does not operate to waive the defense of the Eleventh Amendment." (citing *Fla. Dept. of Health v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 150, (1981) and *Petty v. Tennessee-Missouri Bridge Comm'n*, 359 U.S. 275, 276-277 (1959)).  *See also McGinty v. New York*, 251 F.3d 84, 96 (2d Cir. 2001) (finding that New York State Retirement System was shielded by Eleventh Amendment immunity notwithstanding its designation as "a corporation, endowed with the powers and privileges that inhere to that kind of entity.").  Moreover, to the extent this section relieves the State of the Retirement Systems' contractual obligations, it does not relieve the State of its constitutional requirement to appropriate funds to "insure the availability of funds to meet all normal and accrued liability of the system on a sound actuarial basis."  *See* S.C. Const. Art. X, § 16.

### C.  The Entity's Treatment Under State Law

Another important consideration is the treatment of the Retirement Systems in South Carolina statutory and case law.  While federal courts must now "consider how an entity is treated under state law, 'the question of whether an agency is an *alter ego* of the state . . . is a question of federal, not state, law.'" *Ram Ditta* at 458 n. 5 (quoting *Blake v. Kline,* 612 F.2d 718, 722 (3rd Cir.1979)).  As a result, the court is not bound by state law decisions, nor do these decisions determine the ultimate issue of whether an entity is an arm of the state.  However, state court decisions shed some light on how the entity operates in relation to state law.

The court initially observes that the statutory scheme as described above suggests a close relationship between the State and the Retirement Systems in terms of its administration, its operation and its State-wide purpose.  In addition to the comprehensive statutory scheme

described above, case law also suggests that South Carolina courts treat the Retirement Systems as an arm of the State.

In *Layman II*, the South Carolina Supreme Court viewed the Retirement Systems as a State agency for the purposes of the state action statute, S.C. Code Ann. § 15-77-300, which allows successful plaintiffs to collect attorney's fees when the losing party is a state or a political subdivision of the state. 376 S.C. at 446-7, 658 S.E.2d at 326. The court explicitly referred to the Retirement Systems as a State agency and found the state action doctrine applicable. *Id.* The decision in *Layman II* supports the notion that a suit against the Retirement Systems could in fact impact the treasury since, in that case, both the retirement system proper and the State were considered potentially liable.

In *Ahrens*, the South Carolina Supreme Court treated the Retirement Systems as a State agency in analyzing whether forms used by the Retirement Systems and signed by retirees created binding contracts. 392 S.C. at 350, 709 S.E.2d at 59. The court held that the Retirement Systems did not have "the authority to create contracts without the statutory directive of the legislature," reasoning that an executive agency "cannot convert a statutory right to a contractual right" without necessarily usurping the power of the legislative branch. *Id*. at 351, 709 S.E.2d at 59. This holding not only suggests that the South Carolina courts treat the Retirement Systems as an arm of the State, but it also demonstrates the limited operational powers of the Retirement Systems.

### D.   The Entity's State-wide Reach

The fourth factor most often considered by the courts concerns whether the claims presented involve state-wide, rather than purely local concerns. The Retirement Systems has members throughout the State, and a judgment for Plaintiffs in this case could have

repercussions on other Retirement Systems' members throughout the State.  In addition, the State of South Carolina, as an employer and as a guarantor of the funds' fiscal soundness, contributes to the funding of the system, making the Retirement Systems a truly State-wide concern.

For the reasons stated above, the court holds that the Retirement Systems should be considered an arm of the State such that Eleventh Amendment immunity applies to bar this court from hearing the claim.  This decision comports with similar decisions by courts both within and beyond this district.  The United States District Court for the District of South Carolina has, on two prior occasions, ruled that the South Carolina Retirement System was shielded from suit by the Eleventh Amendment.  *See Pringle v. S.C. Ret. Sys.*, No. 2:06-3294-PMD, 2007 WL 295626 (D.S.C. Jan. 29, 2007); and *United States v. State of S.C.*, 445 F. Supp. 1094, 1099-1100 (D.S.C. 1978).  In both instances, the courts assumed, without discussion, that the Retirement Systems was a state agency without actually addressing the arm-of-the-state factors listed above.  Here, the court has elected to elaborate on the immunity issue as it applies to the Retirement Systems. In so doing, the court has arrived at the same result as the prior rulings in this district.

Courts beyond our circuit have also repeatedly found state retirement systems to be arms of the state.  *See, e.g., State St. Bank & Trust,* 640 F.3d at 827-30 (holding that the Missouri retirement systems are arms of the state); *Ernst,* 427 F.3d at 359-60 (holding that the Michigan retirement system for state court judges and state officials is an arm of the state); *McGinty,* 251 F.3d at 100 (2d Cir. 2001) (holding that the New York Retirement System is an arm of the state); *Fitzpatrick v. Bitzer,* 519 F.2d 559, 561 (2d Cir. 1975) (holding that the Connecticut State Employees' Retirement System is an arm of the state); *Larsen v. State Employees Ret. Sys.*, 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008) (holding that the claims against the Pennsylvania retirement system and the individual defendants are barred by the Eleventh Amendment);

*Sculthorpe v. Va. Ret. Sys.*, 952 F. Supp. 307, 309-10 (E.D. Va. 1997) (holding that the Virginia Retirement System is an arm of the state); *Hair v. Tenn. Consol. Ret. Sys.*, 790 F. Supp. 1358, 1364 (M.D. Tenn. 1992) (holding that the Tennessee Consolidated Retirement System is a state agency for Eleventh Amendment purposes); *Mello v. Woodhouse*, 755 F. Supp. 923, 930 (D. Nev. 1991) (holding that a suit against the Nevada Public Employees' Retirement Board was barred by the Eleventh Amendment); *Reiger v. Kan. Pub. Employees Ret. Sys.*, 755 F. Supp. 360, 361 (D. Kan. 1990) (finding the Kansas Public Employees Retirement System to be a state agency and granting its motion to dismiss on Eleventh Amendment grounds.)

Plaintiffs challenge to the Retirement Systems' Eleventh Amendment immunity defense relies on the Fourth Circuit's decision in *Almond v. Boyles*, 792 F.2d 451 (4th Cir. 1986). In *Almond*, the Fourth Circuit affirmed a ruling by the United States District Court for the Eastern District of North Carolina that granted summary judgment to plaintiffs who were suing the North Carolina Teachers' and State Employees' Retirement System ("NC Retirement System"). *Id.* at 456. The district court rejected the NC Retirement System's defense that it was immune from suit under the Eleventh Amendment. *See Almond v. Boyles*, 612 F. Supp. 223, 228 (E.D.N.C. 1985). In its analysis, the district court employed a two-part test, which examined "(1) the degree of autonomy given to the agency and (2) whether recovery against it would come from state funds." *Id.* at 227. The district court found that the "autonomy factor" did not favor either side, noting on the one hand "detailed statutory provisions governing the Retirement System," the appointment of members of the governing board, and the treasury department's management and administrative functions, all of which suggested state control, while on the other hand noting the NC Retirement System's designation as a body corporate with rights to sue and be sued as well as acquire and hold property. *Id.* On the issue of whether recovery would come from state

funds, the district court determined that "a substantial portion of the money held by the retirement system was not appropriated by the General Assembly," but instead came from employers, employees, and investment income. *Id.* The district court further noted "state funds appropriated to the Retirement System lose their identity as general revenue funds and become earmarked for a particular purpose." *Id.* Finally, the district court found that the defendants could not show that the requested relief "would inevitably lead to an additional appropriation of state funds." *Id.* Specifically, the defendants were not able to "rebut plaintiffs' contention that the requested relief may be satisfied by investment income or a slight decrease in the amount of benefits paid to other beneficiaries of the Retirement System." *Id.*

In reaching its conclusion, the district court distinguished *Fitzpatrick v. Bitzer,* 519 F.2d 559 (2d Cir. 1975), a case involving a suit against the Connecticut State Employees' Retirement Commission. *Almond*, 612 F. Supp. at 228. The *Fitzpatrick* court found that "a judgment against the fund would automatically increase the obligation of the general state treasury" due to a requirement that at least 75% of the total retirement income payment of each year had to be made by the state." *Fitzpatrick*, 519 F.2d at 565. The Fourth Circuit implicitly adopted the district court's findings by rejecting the defendants' appeal on Eleventh Amendment immunity as "meritless . . . for the reasons stated by the district court." *Almond,* 792 F.2d at 456.

The *Almond* decisions are distinguishable from the case currently before this court.[12] On the question of autonomy, the district court in *Almond* found that the NC Retirement System had at least some compelling characteristics of an independent body leading the court to find that the entity was autonomous rather than an arm of the state. 612 F. Supp. at 227. In this case,

---

[12] This court does not have the benefit of the full statutory scheme of the North Carolina Retirement System as it existed in 1985 when the *Almond* suit was brought. As such, the court does not make a detailed comparison between the systems.

however, the court finds that the Retirement Systems are significantly constrained by the governing statutes despite the fact that it too is created with the "powers and privileges of a corporation."[13]  S.C. Code Ann. § 9-1-20.  The statutory scheme details virtually all of the administrative functions of the system, from who can be members, to how, where, and when the funds can be distributed.  In addition, high-ranking political figures sit on the State Budget and Control Board and appoint Commissioners to invest the retirement funds who, in turn, report quarterly to the same high-ranking officials.  In addition, the General Assembly has the power to appropriate funds and prescribe member contributions.  The South Carolina statutory scheme strongly supports the court's finding that both the operational and political independence of the Retirement Systems is extremely limited.

The district court in *Almond* also gave little weight, if any, to relevant state court decisions, stating "the question of Eleventh Amendment immunity is ultimately one of federal law." 612 F. Supp. at 227.  Interestingly, the court mentioned, but declined to accord any weight to a then-recent North Carolina Court of Appeals decision, which suggested that the Eleventh Amendment would likely bar an award of money damages against the NC Retirement System. *Id.* (discussing *Stanley v. Retirement and Health Benefits Div.*, 66 N.C. App. 122, 310 S.E.2d 637 (1984)).  The Fourth Circuit's more recent jurisprudence regarding the armof-the-state analysis explicitly requires district courts to consider how the state entity is treated by state law and state courts.  *See Oberg*, 681 F.3d at 580; *Hoover Univ. Inc.*, 535 F.3d at 303.  As noted above, the South Carolina Code of Laws provides a comprehensive statutory scheme governing the Retirement Systems.  Furthermore, very recent decisions by the South Carolina Supreme

---

[13] As discussed above, the fact that a state entity is designated within the statute as a corporation or body corporate does not negate the fact that it is a state entity and potentially protected under the state's Eleventh Amendment immunity.

Court treat the Retirement Systems as an arm of the State, not simply by virtue of the fact that the cases refer to the Retirement Systems as a State agency, but also by the treatment of the Retirement Systems in relation to the State and State laws.

In addition, the *Almond* district court decision did not give explicit attention to the state-versus-local-concern prong of the test. This is a separate and distinct requirement of the Fourth Circuit's current analytical framework. As noted above, the State-wide scope of the Retirement Systems lends credence to the finding that it is an arm of the State.

Furthermore, the district court in *Almond* found that "a substantial portion of the money held by the retirement system was not appropriated by the general assembly," and thus, "an award of monetary relief would not infringe on the state's 'general revenue funds'" *Id.* at 277. For purposes of the Eleventh Amendment, it is not apparent that the amount contributed by the state to the fund should matter in the analysis. The analysis in this circuit and in other circuits looks at whether the state treasury might be affected with no requirement that the impact be substantial or even assured. *See Martin*, 654 F. Supp. 2d at 418, *Ernst* 427 F.3d at 359.

For these reasons, the Fourth Circuit's decision in *Almond* is not determinative in this case. In merely affirming a district court's decision regarding a retirement system in North Carolina, the decision makes no sweeping statement regarding the application of Eleventh Amendment immunity to retirement systems generally. Using the Fourth Circuit's most recent analysis in *Hoover Univ. Inc.*, 535 F.3d at 303, this court finds that South Carolina's Retirement Systems should be considered an arm of the State. As a result, the Eleventh Amendment applies, and this court is barred from hearing the case.[14]

---

[14] Because Plaintiffs seek monetary damages, the claims against the individual Defendants are also barred. *See Harter v. Vernon*, 101 F.3d 334, 337 (4th Cir. 1996) (observing that the

**CONCLUSION**

Having found that Defendants are immune from suit, the court determines that it lacks the requisite subject matter jurisdiction to address the merits of Plaintiffs' claims.  Accordingly, the court **GRANTS** Defendants' Supplemental Motion to Dismiss [Dkt. No. 32] pursuant to Federal Rule of Civil Procedure 12(b)(1) and declines to address the remaining issues raised in the motion.  This case is dismissed in its entirety.

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Court

September 27, 2012
Greenville, South Carolina

---

Eleventh Amendment immunity extends to entities considered "arms of the state" and its employees acting in their official capacity.)